# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PNINA LUTMAN, | : | CIVIL ACTION NO. 1:10-CV-1504 |
| Petitioner | : | |
| | : | (Judge Conner) |
| v. | : | |
| | : | |
| EYAL LUTMAN, | : | |
| | : | |
| Respondent | : | |

## MEMORANDUM

On July 21, 2010, petitioner Pnina Lutman ("Pnina") filed a petition (Doc. 1) for the return of minor child D.L., her nine-year-old son, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or the "Convention").[1] In the instant case, Pnina claims that respondent Eyal Lutman ("Eyal"), D.L.'s father, has wrongfully retained D.L. in the United States, away from D.L.'s habitual residence in Israel, in violation of Pnina's custody rights. Pnina presented evidence in support of the petition at a hearing

---

[1] The Hague Convention is a treaty that provides for the immediate return of a child who has been wrongfully removed or retained from his or her habitual residence. It "provides a legal process 'to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases.'" Karpenko v. Leendertz, Nos. 10-1678 & 10-1825, 2010 WL 3326131 at *2 (3d Cir. Aug. 24, 2010) (quoting Tsai-Yi Yang v. Fu-Chiang Tsui, 499 F.3d 259, 270 (3d Cir. 2007)). Judicial proceedings for the return of the child are filed in the jurisdiction where the child is located. Importantly, Hague Convention cases are *not* child custody cases. The end result is simply a provisional remedy, to wit: a return of the child to his or her habitual place of residence. In effect, the court's decision dictates where the custody dispute will be resolved.

held on August 4, 2010.[2] Eyal was not represented by counsel and requested additional time to obtain counsel and to respond to Pnina's allegations. The court granted Eyal's request. Counsel for Eyal entered his appearance on August 17, 2010,[3] and the hearing continued on August 20, 2010.[4]

For the reasons that follow, the court will grant the petition.

I. **Findings of Fact**

The court finds the following facts on the basis of the record in the above-captioned case, including the petition, the exhibits admitted into evidence, and the testimony and other evidence presented at the hearings. These findings reflect the court's determinations of witness credibility, and they specifically resolve conflicts created by the testimony of the parties.

---

[2] Citations to the August 4, 2010 hearing transcript are abbreviated throughout as "8/4 Hr'g Tr."

[3] Eyal's counsel obtained a copy of the transcript of the August 4, 2010 proceeding and was well prepared for the August 20, 2010 proceeding. Indeed, the court commends counsel for both parties for their thorough, professional, and earnest representation of their respective clients under the difficult circumstances inherent in Hague Convention matters.

[4] The court is acutely aware of the need for prompt disposition of Hague Convention cases. Article 11 of the Convention requires the court to act "expeditiously," and it provides that Central Authorities will make inquiry in a matter which has been pending for more than six weeks. In light of these directives, the court temporarily suspended a multi-defendant criminal jury trial in order to accommodate the August 20, 2010 hearing and address the instant matter expeditiously.
  As of the date of this opinion, the transcript of the August 20, 2010 hearing is not yet available. The court has referred to a draft of the transcript, and citations to this document are abbreviated throughout as "8/20 Hr'g Tr." The parties should note, however, that pagination of the rough draft may vary from pagination of the transcript, when it is released.

Pnina and Eyal were married in 1986 in Israel, and their first child, a daughter named Hadar, was born in 1988. In 1989, Pnina and Eyal, who are both dual citizens of the United States and Israel, moved to the United States—specifically, to Kansas. Another daughter, Meirav, was born in Kansas in 1990. In 1996, the family returned to Israel. Approximately four years later, they relocated to California. D.L. was born in California on April 10, 2001.

The parties' marital relationship gradually deteriorated and they agreed to divorce. They entered into a marital separation agreement on June 22, 2005, and a California state court finalized their divorce on September 9, 2005. Pnina and Eyal also obtained a divorce decree from a Rabbinical Court in California, and they obtained a decision from a Rabbinical Court in Israel, acknowledging the California Rabbinical Court's decision.

As a part of their divorce, Pnina and Eyal entered into a written separation agreement, which resolved the issue of custody of their children, by providing for joint legal and physical custody. Significantly, the agreement states that D.L. "shall primarily reside" with Pnina and that his older sisters "shall primarily reside" with Eyal. The custody provisions also forbid either parent to move outside of Orange County, California, without further order of the court or written permission from the other party. Despite this provision, Pnina returned to Israel with D.L. and Meirav in 2005, shortly after the divorce. Indeed, Eyal encouraged Pnina, D.L., and Meirav to return to Pnina's family in Israel and he paid for their airfare. As a result

of a change in his work assignments, undertaken at his request, Eyal also returned to Israel a few months later with Hadar.

The California separation agreement also provided that the parties agreed "to meet and confer regarding any necessary changes in their parenting plan" in the event that one of them moved, and that, if they could not negotiate a new agreement, they would "mediate the issue, equally sharing in the cost of the mediation." (Doc. 1, Ex. E). In order to reflect the change in their circumstances, particularly their residence, the parties voluntarily appeared before the Rabbinical Court of Haifa in Israel in 2007, which affirmed that D.L. is or will be in his mother's custody in Israel. [5]

---

[5] The proper translation of the Rabbinical Court's order is in dispute. Eyal claims that the Rabbinical Court's order is wholly subordinate to the separation agreement entered in California. (See 8/20 Hr'g Tr., p. 34-39, 152.) He contends that the time restrictions on D.L.'s visits to Israel (60 days (see Doc. 1, Ex. E ¶ 9)) contained in the California agreement remain in force. Pnina asserts that the Rabbinical Court confirmed her custody of D.L. in Israel, thus modifying the restrictions on travel in the California agreement. (See 8/20 Hr'g Tr., p. 38, 53-55.) Pnina also presented the testimony of an interpreter, who testified that the verb pertaining to D.L.'s custody could be translated either in the present tense—"is"—or the future tense—"will be." (See id. at 69.) Eyal maintains that the verb pertaining to custody is properly translated in the present tense—"is"— and that this language *only* meant that, at the time, D.L. was primarily staying overnight with his mother. (See id. at 151.)

Logic dictates that Pnina's interpretation is the correct one. There would be no reason for the Rabbinical Court to confirm the travel restrictions of the California agreement, which both parties had violated and clearly intended to ignore. Obviously, the parties voluntarily submitted to the jurisdiction of the Rabbinical Court to adjust the custody status of D.L. to reflect current circumstances. If the court's interpretation is incorrect, the matter can easily be corrected by the Rabbinical Court of Haifa upon D.L.'s return to Israel.

4

Eyal left Israel in 2007 and relocated to Ohio. Pnina encouraged D.L.'s relationship and regular contact with Eyal, not only during Eyal's residence in Israel, but also after Eyal returned to the United States. Accordingly, when Eyal invited his children to visit during their vacation in the summer of 2008, Pnina agreed to facilitate their visit. Clearly, Pnina was exercising her custody rights under the Rabbinical Court decree at the time she sent D.L., with arrangements of a round trip ticket, to the United States for this visit with his father. And she expected D.L.'s return on August 29, 2008, the date of Meirav's and D.L.'s return flight to Israel. On August 29, 2008, only Meirav returned to Israel, and Eyal retained D.L. in his custody. Eyal did not have Pnina's consent to retain D.L. in the United States, and he acted unilaterally to retain D.L. Indeed, the record indicates that this was a last-minute, emotional decision by Eyal to violate the terms of the custody decree of the Rabbinical Court of Haifa. The record also reflects that Pnina was shocked and appalled at Eyal's precipitous actions. D.L. has never returned to Israel since the summer of 2008, despite Pnina's efforts to have him returned.

In May of 2009, Eyal and D.L. moved to Red Lion, in Pennsylvania. Pnina visited D.L. in Red Lion for approximately four weeks in August 2009, in an attempt to secure his return informally. Eyal initially permitted Pnina to stay in his residence during her visit in the United States. However, Pnina testified that Eyal became jealous of D.L.'s reunion with his mother and feared that D.L. would ask to return to Israel with Pnina. In order to prevent such an occurrence, Eyal contacted authorities and alleged that Pnina had sexually abused D.L. Authorities conducted

5

a brief, fruitless investigation of the allegations of child abuse, which concluded with an "unfounded" finding. The record from the instant proceeding is devoid of any evidence that sexual abuse actually occurred, and the court finds that Eyal's accusation was baseless. At the conclusion of the investigation, financial constraints required Pnina to return to Israel, and she returned without D.L. and without resolution of D.L.'s custody. The court credits Pnina's testimony with respect to these events.

Pnina continued to seek D.L.'s return, and she diligently pursued her rights under the Convention. She initially contacted authorities on the Hague Convention and began completing paperwork in August of 2009. (See 8/4 Hr'g Tr., p. 73.) In October of 2009, she commenced official proceedings under the Hague Convention, and she requested *pro bono* legal representation from the Legal Assistance Coordinator (the "LAC") in the U.S. Central Authority for the Hague Convention, which is the U.S. Department of State. (See Doc. 25, Ex. V.) However, it was not until March of 2010 that Pnina successfully retained a *pro bono* attorney.[6] (Id.) It took her attorney a few months to prepare the materials and translations submitted

---

[6] In October and November of 2009, the LAC contacted several attorneys to see if they would agree to be included on an attorney referral list to be sent to Pnina. (See Doc. 25, Ex. V.) Such attorney referral lists usually include two or three attorneys and may also include a legal aid organization. (Id.) In December of 2009, the LAC prepared a referral list of two attorneys and a legal aid entity and sent it, through the Israeli Central Authority for the Hague Convention, to Pnina. (Id.) Pnina was not successful in securing representation, so LAC contacted additional attorneys in February of 2010 and prepared a second attorney referral list. (Id.) Pnina found the attorney whom she ultimately retained from this second referral list.

to the court with the pending petition. (See 8/4 Hr'g Tr., p. 73.) As previously noted, Pnina filed this petition pursuant to the Hague Convention, which was implemented into U.S. law through the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601-10. In accordance with the Convention, she filed the petition in this court, the jurisdiction in which D.L. is presently residing.

**II. Analysis and Conclusions of Law**

**A. Legal Framework**

The Hague Convention requires the petitioner to prove, by a preponderance of the evidence, that a child under the age of sixteen has been wrongfully removed or retained from his or her place of habitual residence in violation of the custody rights of the parent left behind. See Hague Convention, Arts. 3, 4. Determining whether removal or retention was wrongful generally requires a court to address the following four issues, as articulated by the Third Circuit: "(1) when the removal or retention took place; (2) the child's habitual residence immediately prior to such removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) whether the petitioner was exercising his or her custody rights at the time of removal or retention." Tsai-Yi Yang v. Fu-Chiang Tsui, 499 F.3d 259, 270-71 (3d Cir. 2007).

If the petitioner proves his or her cause of action, then the burden shifts to the respondent to establish an affirmative defense against the return of the child. There are several affirmative defenses that a respondent might invoke. The first four must be proven by a preponderance of the evidence: (1) the left-behind parent

7

consented to, or subsequently acquiesced in, the removal or retention of the child; (2) the petitioner delayed more than one year in commencing the proceedings and the child is settled in his or her new environment; (3) the left-behind parent was not exercising his or her custodial rights at the time of the child's removal or retention; or (4) the court finds "that the child objects to the return and has attained an age and degree of maturity at which it is appropriate to take account" of the child's wishes. The remaining two affirmative defenses must be proven by clear and convincing evidence: (1) the child's return would violate the policies of the requested state concerning human rights and fundamental freedoms; or (2) the child's return would result in a grave risk of physical or psychological harm to the child, or place the child in an intolerable situation.

In order to further the purposes of the Hague Convention, the court must construe each of these defenses narrowly. Tsui, 499 F.3d at 271. Furthermore, even if the court determines that one of the affirmative defenses applies, it is within the court's discretion to order the child's return to his or her habitual residence. Id.

### B. Pnina's Cause of Action

D.L., the child at the center of this case, is nine years old. The relevant dates concerning D.L.'s removal from Israel and retention in the United States are not in dispute. The parties agree that D.L. departed from Israel on July 15, 2008, and that his return flight was scheduled for August 29, 2008. Hence, the date of the allegedly wrongful retention is August 29, 2008.

The record is clear that Eyal's retention of D.L. in the United States violated Pnina's custody rights.[7] As the court has already noted, (see supra note 5 and accompanying text), the Rabbinical Court of Haifa formally adjusted D.L.'s primary physical custody to his mother *in Israel*. Furthermore, Pnina was clearly exercising her custody rights at the time of D.L.'s retention in the United States. The court notes that even a minimal exercise of custody rights will satisfy this requirement. "Essentially, nothing short of clear and unequivocal abandonment will prove that the petitioner failed to exercise his or her custodial rights." Tsui, 499 F.3d at 277. In this case, D.L. had a round-trip ticket and Pnina expected him to return with his sister on August 29, 2008. Pnina also maintained regular contact with D.L., and she made ongoing attempts to exercise her custody rights and secure his return to Israel. Under these circumstances, the court has no difficulty concluding that Pnina has met her minimal burden to demonstrate the actual exercise of custody rights.

Finally, turning to the question of habitual residence, the evidence of record supports only one conclusion: Israel was D.L.'s habitual residence immediately prior to his retention in the United States. According to the Third Circuit, "a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled

---

[7] Assuming, *arguendo*, that the California separation agreement controlled the issue of custody, as Eyal asserts that it does, his unilateral retention D.L. would nevertheless violate Pnina's custody rights, because the California agreement gave Pnina and Eyal joint physical and legal custody of D.L.

9

purpose' from the child's perspective." Feder v. Evans-Feder, 63 F.3d 217, 224. The Third Circuit has observed that "a determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there." Id. Under this standard, Israel qualifies as D.L.'s habitual residence.

Even though D.L. was physically present in the United States for slightly more than a month immediately prior to his retention, there is no evidence that D.L. had sufficient time to acclimate to life in the United States. Nor does the evidence indicate that D.L. would have perceived a "degree of settled purpose" in his father's Ohio home. By all accounts, D.L.'s trip to Ohio was intended as nothing more than a temporary summer vacation with his father. Hence, the United States did not become D.L's habitual residence prior to his retention.

By contrast, Israel has all of the characteristics of a place of habitual residence. D.L. lived in Israel for three years—from June of 2005 to July of 2008. He was schooled in Israel and the vast majority of his family resided there. He was acclimated to life in Israel during that time, and he undoubtedly felt settled there. Both of his parents established households in Israel, (see 8/20 Hr'g Tr., p. 21-22, p. 145), and Eyal left Israel less than one year prior to D.L.'s July 2008 visit. The record evidence clearly establishes Israel as D.L.'s habitual residence.

Based on all of these findings, the court concludes that Pnina has established that D.L. was wrongfully retained from his place of habitual residence in violation of her custody rights. The court will therefore turn to Eyal's affirmative defenses.

### C. **Eyal's Defenses**

At this phase of the court's analysis, Eyal has the opportunity to prove that D.L. should not be returned, under one of the exceptions enumerated in Article 13 of the Hague Convention. In the instant case, Eyal alleges that Pnina consented to D.L.'s removal; that Pnina acquiesced in Eyal's retention of D.L.; and that Pnina failed to initiate proceedings under the Convention within one year of the retention, and that D.L. is well-settled in his current location. The court will address each of these contentions in turn.

Eyal argues that the court should infer consent to retention by virtue of Pnina's willingness to send D.L. to the United States. This argument misapprehends claims set forth in the petition and conflates removal and retention. The petition does not allege D.L.'s wrongful *removal* from Israel—rather, it complains that D.L. was wrongfully *retained* in the United States. D.L. went to Ohio with a round-trip ticket to return on August 29, 2008. There is no evidence that Pnina agreed that Eyal could retain D.L. in the United States after August 29, 2008. Therefore, the court will reject the consent defense and turn to the question of whether Pnina acquiesced in the retention.

According to Eyal, "[t]he record is devoid of any evidence" that Pnina made efforts to secure D.L.'s return to Israel. He contends that Pnina failed to pursue any

11

custodial rights from August 29, 2008, until her visit to the United States in the summer of 2009. The record does not support this argument. To the contrary, Pnina's testimony is replete with evidence of her attempts to secure D.L.'s return: she never agreed to relinquish custody; during phone calls, she begged Eyal to return D.L.; and she searched (albeit unsuccessfully) for a lawyer in Israel. (See 8/4 Hr'g Tr., p. 29, 36-37.) The court also notes that Pnina undertook these actions despite suffering the loss of her father and her mother during this time period. That these circumstances did not cause Pnina to cease ongoing efforts to secure D.L.'s return is a testament to her resolve and squarely refutes the suggestion of acquiescence. When she came to the United States in August 2009, she made the trip in hopes that she could persuade Eyal to permit D.L. to return to Israel with her, and she continued to seek help. (See id. at 47.) All of this evidence demonstrates that Pnina never acquiesced to Eyal's retention of D.L., and, therefore, the court rejects this affirmative defense.

Turning to the third defense raised by Eyal, the court notes that Pnina commenced proceedings under the Hague Convention in October of 2009, more

than a year after the wrongful retention of D.L. on August 29, 2008.[8]  Thus, the court must address the murky issue of whether D.L. is "well-settled" in his current location.  Eyal has attempted to show that D.L. is well-settled in his current location, but his efforts have only been partially successful.  In analyzing the applicability of the well-settled defense to a particular case, courts should look for "substantial evidence of the child's significant connections to the new country[,]" Castillo v. Castillo, 597 F. Supp. 2d 432, 437-38 (D. Del. 2009) (quoting Hague Int'l Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494, 10509 (Mar. 26, 1986)), and "consider any relevant factor informative of the child's connection with his or her living environment."  Id. at 438 (quoting Silvestri v. Oliva, 403 F. Supp. 2d 378, 387 (D. N.J. 2005)).  Considering all of the relevant factors together, the court cannot find, by a preponderance of the evidence, that D.L. is well-settled.

---

[8] Pnina urges the court to apply equitable tolling to the instant case, based on the fact that Eyal gave Pnina false hope that he would return D.L. in the months following his retention.  Pnina cites Blanc v. Morgan, No. 10-cv-02314, 2010 WL 2696791 at *9 (W.D. Tenn. July 9, 2010) for the proposition that the one-year statute of limitations may be tolled until the date at which one parent *truly believed* that the other parent would not return the child to his or her habitual residence.  According to Pnina, it was not until August 20, 2009—the date on which Pnina left the United States without D.L.—that Pnina truly believed that Eyal would not return D.L. to Israel.  The court cannot accept this argument.  According to Pnina's own testimony, she began to look for a lawyer a few months after D.L. arrived in the United States, (see 8/20 Hr'g Tr., p. 27-29), and she did so because she realized that Eyal would not return D.L. to Israel, (see id. at 27).  Although Pnina's attempts to find a lawyer were initially unsuccessful, they nevertheless reflect Pnina's awareness that Eyal was resistant to returning D.L. to Israel.  Hence, the preponderance of the evidence indicates that Pnina delayed more than one year in bringing proceedings under the Hague Convention.

To Eyal's credit and to D.L's credit, and to the substantial credit of D.L.'s teachers, D.L. acclimated well to his studies during his one full year of elementary school in Red Lion, Pennsylvania. D.L.'s native language is Hebrew, but he is approaching fluency in English, and his English language support teacher anticipates that he could be released from her tutelage in approximately one year. In addition, his third grade teacher testified that D.L. assimilated into the classroom and that she observed appropriate academic progress and social interaction during the school year. D.L.'s elementary school experience weighs in favor of a finding that he is well-settled.

However, there is sparse evidence that D.L. is settled with respect to the other factors that the court must consider in its analysis, including the child's age, stability in the child's residence, the child's participation in extracurricular or community activities, the presence of friends or relatives in the area, and the respondent's employment and financial position. See In re B. Del C. S. B., 559 F.3d 999, 1009 (9th Cir. 2009); see also Castillo, 597 F. Supp. 2d at 438.

Eyal presented limited evidence on each of these factors, but the evidence does not demonstrate that D.L. had a significant connection to the community where he currently lives. D.L. is still quite young. During the period of his wrongful retention in the United States, he has resided in three different locations and attended three different schools. Although D.L. has connected with a handful of acquaintances and peers since that time, the network of friends surrounding him is limited. With respect to family and relatives, there can be no doubt that he has

14

far more connections in Israel. Eyal testified that he expects his employment and finances to be stable for the foreseeable future, but Eyal has been with his current employer for only fifteen months (since May of 2009), and he has a history of instability in his employment and finances. For example, Eyal admits that he exhausted all of his financial resources in Israel and was "broke" when he moved to Ohio. (See 8/20 Hr'g Tr., p. 261.) In addition, the record does not reflect that D.L. or Eyal have established connections to any church or synagogue, engaged in any extracurricular activities or other community involvement in central Pennsylvania. Moreover, there is no evidence of family relations in the area, with the exception of occasional visits by Hadar. D.L. has had several nannies, the most recent of which was retained approximately one month ago. D.L. appears to spend a considerable amount of time watching television and playing video games. Accordingly, the court finds that D.L.'s "significant connections" to central Pennsylvania are limited to his one full year of elementary school and some employment stability for Eyal, and that D.L. does not have any other significant connections to his community. After carefully weighing all of the relevant factors, the court concludes that D.L. is *not* well-settled in his current location.

For all of the reasons discussed above, the court finds that Eyal has failed to prove that any of the exceptions listed in Article 13 of the convention apply to this case.[9]

### D. Court's Discretion

Even when a respondent proves that an exception to the Hague Convention applies in a particular case, the court has discretion to decide whether or not to order the child's return. In recognition of this discretion, the court will set forth additional reasons for granting the petition.

First, the court notes that the most recent action taken by the parties concerning custody of D.L. was to seek a custody order from the Rabbinical Court of Haifa, in Israel. Both parties voluntarily appeared for the proceeding and submitted the matter to the Rabbinical Court's jurisdiction. Eyal now alleges that the Rabbinical Court's order merely affirmed the California custody agreement. Assuming, *arguendo*, that Eyal's position is correct, he should have no problem

---

[9] The only other affirmative defense that might have been implicitly raised in the record is the defense that D.L.'s return to Israel would place him in grave risk of harm or an intolerable situation. Specifically, Eyal testified about a suicide bombing that occurred close to where Pnina and her family lived with D.L. in Israel. (See 8/20 Hr'g Tr., p. 154-58.) He also testified that he had many concerns about the neighborhood in which Pnina and her family resided, which he described as "a neighborhood known for its criminality." (See id. at 153-54.) This evidence, however, does not constitute clear and convincing evidence that the "grave risk of harm" defense applies to the instant case. In Baxter v. Baxter, 423 F.3d 363, 373-74 (3d Cir. 2005), the Third Circuit emphasized that this exception applies only in very narrow circumstances, and it held that "the respondent must cite specific evidence of potential harm to the child upon his return." Eyal's evidence falls short of this standard. Moreover, Pnina has directed the court's attention to numerous cases holding that Israel is not a "zone of war" for purposes of the Hague Convention, and neither party has apprised the court of any contrary authority.

16

convincing that tribunal of his custodial rights. Indeed, Eyal's assertion underscores the propriety of Israeli jurisdiction as the forum for resolution of the custody dispute, as both parties have willingly submitted to an Israeli tribunal in the recent past. Moreover, it is undisputed that the Rabbinical Court of Haifa issued the most recent decree addressing D.L.'s custody. There is no apparent reason why the instant dispute should not be resolved in the same forum.

Second, the court observes that Eyal has engaged in behavior that is manipulative and otherwise contravenes the purposes of the Hague Convention, and he should not be rewarded for such behavior. At the last minute, Eyal unilaterally decided not to return D.L. to Israel, and he has confirmed his intent to keep D.L. in the United States permanently, with no regard for Pnina's custody rights. Worse, Eyal brought a baseless complaint of sexual abuse to authorities during Pnina's visit in Red Lion, in a desperate attempt to maintain control of D.L.'s custody. Eyal's improper conduct also compels the court to exercise its discretion to return D.L. to Israel.

### III. Conclusion

For the foregoing reasons, the court will grant the petition (Doc. 1) for the return of minor child D.L.  An appropriate order follows.


                                                  <u>S/ Christopher C. Conner</u>
                                                  CHRISTOPHER C. CONNER
                                                  United States District Judge


Dated:        August 26, 2010

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PNINA LUTMAN, | : | CIVIL ACTION NO. 1:10-CV-1504 |
| Petitioner | : | |
| | : | (Judge Conner) |
| v. | : | |
| | : | |
| EYAL LUTMAN, | : | |
| | : | |
| Respondent | : | |

## ORDER

AND NOW, this 26th day of August, 2010, upon consideration of the petition (Doc. 1) for the return of minor child D.L., filed by petitioner Pnina Lutman, and following a hearing, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. The petition (Doc. 1) for the return of minor child D.L. is GRANTED.

2. Petitioner is directed to file a response, on or before Friday, September 10, 2010, indicating whether or not she intends to file a motion for respondent to pay necessary expenses incurred by her or on her behalf in furtherance of the petition. See 42 U.S.C. § 11607(b)(3) ("Any court ordering the return of a child pursuant to an action brought under [the Hague Convention] shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, . . . and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.").

3. The Clerk of Court is directed to return forthwith respondent's passport to respondent or his counsel, and to provide D.L.'s passport to petitioner or her counsel.

    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge